# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

**ROBERT WOODROFFE**,

        Plaintiff,

   v.

**STATE OF OREGON, *et al*.**,

        Defendants.

Case No. 2:12-cv-00124-SI

**OPINION AND ORDER**

Robert Woodroffe, Two Rivers Correctional Institution, 82911 Beach Access Road, Umatilla, OR 97882-9419. Plaintiff *pro se*.

Jake J. Hogue and Shannon M. Vincent, Oregon Department of Justice, Trial Division, CLS, 1162 Court Street, N.E., Salem, OR 97301-0346. Of Attorneys for Defendants Carnig, Czerniak, Doman, Eastwood, Flores, Geer, Gulick, Real, Reding, Serrano, Shelton, Spang.

**Michael H. Simon, District Judge.**

      Before the Court is Defendants' motion for summary judgment on all remaining claims

of Plaintiff Robert Woodroffe ("Plaintiff") against officials of the Oregon Department of

Corrections (collectively, in whole or in part, "Defendants") for alleged violations of the First,

Eighth, and Fourteenth Amendments.[1] Plaintiff, proceeding *pro se*, also filed a cross-motion for

---

[1] Defendants also raise numerous evidentiary objections to Plaintiff's declarations and assertions (Dkts. 225 and 226) and the Declaration of Denny Johnson (Dkts. 248 and 248-1). The Court only considers admissible evidence in deciding the pending motions.

summary judgment. In Plaintiff's motion, however, he argues that factual disputes exist and demands a jury trial to resolve them. The Court thus denies Plaintiff's motion for summary judgment and construes Plaintiff's motion as opposition to Defendants' motion for summary judgment, in addition to Plaintiff's other filings in opposition. For the reasons discussed below, Defendants' motion is granted.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND

Plaintiff is incarcerated in the State of Oregon's prison system, which is operated by the Oregon Department of Corrections ("ODOC"). In January 2012, Plaintiff filed this action, alleging federal and state claims against approximately 60 defendants. Only a handful of those claims and defendants remain, either because the Court dismissed or Plaintiff conceded many of

them. The claims remaining before the Court, which Plaintiff brings pursuant to 42 U.S.C.
§ 1983, allege that Defendants violated Plaintiff's First, Eighth, and Fourteenth Amendment rights.

Specifically, Plaintiff's remaining claims allege: (A) Eighth Amendment violations by Steve Shelton, M.D., and Garth Gulick, M.D., relating to their treatment of Plaintiff's knee and coccyx pain and an incident involving blood loss, and by Patricia Carnig, R.N., and Patricia Flores, R.N., relating to an incident involving blood loss; (B) Fourteenth Amendment violations by Inspector General Stan Czerniak and Hearings Officer Frank Serrano, stemming from disciplinary hearings within ODOC; and (C) First Amendment free-speech violations in three respects. The initial First Amendment claim is a facial challenge to the constitutionality of ODOC's prohibited-mail policy, which, in part, bans inmates from receiving freestanding nude or partially nude images in the mail. The second First Amendment claim is an "as-applied" challenge to the regulations, as allegedly enforced by Bill Doman, Steven Spang, and Randy Geer. The final First Amendment claim alleges retaliation by Drs. Shelton and Gulick relating to medical care; by Captain Robert Real and Captain James Eastwood, relating to misconduct reports; and by Mr. Doman and Mr. Spang, relating to the non-delivery of Plaintiff's incoming mail. The Court discusses additional facts as it addresses each claim.

## DISCUSSION

Because Plaintiff proceeds *pro se*, the Court construes his filings liberally. *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A *pro se* party involved in civil litigation, however, is held to the same standards in responding to a motion for summary judgment and "should not be treated more favorably than parties with attorneys of record." *Jacobsen v. Filler*, 790 F.2d 1362, 1364 (9th Cir. 1986); *see also Warden v. Robinson*, 2014 WL 252308, at *5 (D. Ariz. Jan. 23, 2014) ("A *pro se* litigant is held to the same standard in responding to a motion for summary

PAGE 3 – OPINION AND ORDER

judgment as a represented party."). Additionally, "[i]t is not the district court's job to sift through the record to find admissible evidence in support of a non-moving party's case." *Claar v. Burlington N.R.R.*, 29 F.3d 499, 504 (9th Cir. 1994) (quoting *Celotex*, 477 U.S. at 324). Therefore, where Plaintiff does not identify specific evidence in the record to support his assertions, the Court is not required to search for it.

## A.  Eighth Amendment Claims

Plaintiff brings claims for Eighth Amendment violations alleging inadequate responses by Dr. Shelton, Dr. Gulick, Nurse Carnig, and Nurse Flores to an incident of blood loss. He also brings an Eighth Amendment claim against Dr. Shelton and Dr. Gulick alleging indifferent responses to his purported knee and coccyx pain. Defendants argue that they are entitled to summary judgment on Plaintiff's Eighth Amendment claims because: (1) the claims fail as a matter of law; (2) Defendants are entitled to qualified immunity; and (3) Plaintiff's claims relating to coccyx and knee pain are precluded by a previous judgment. Because the Court finds no genuine issue of disputed fact with respect to all of Plaintiff's Eighth Amendment claims and that Defendants are entitled to judgment as a matter of law, the Court does not address Defendants' immunity and preclusion arguments.

The government has an "obligation to provide medical care to those whom it is punishing by incarceration." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Deliberate indifference to serious medical needs constitutes unnecessary and wanton infliction of pain, which is proscribed by the Eighth Amendment. *Id.* at 104. In this context, however, "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.* at 106. To state a claim relating to medical care under Section 1983, a prisoner must "allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.* Allegations and evidence that a medical professional was negligent in diagnosing or treating a

medical condition is insufficient to support a claim of medical mistreatment under the Eighth Amendment. *Id.*

To establish an Eighth Amendment violation under Section 1983, a prisoner must satisfy "both the objective and subjective components of a two-part test." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002)). First, the plaintiff must show that the jail official deprived him of the "minimal civilized measure of life's necessities." *Id.* (citation and quotation marks omitted). Second, he must demonstrate that the jail official "acted with deliberate indifference in doing so." *Id.* (citation and quotation marks omitted). Under this standard, for example, a medical decision to decline ordering an x-ray is not a constitutional violation, but is a matter for medical judgment. *Estelle*, 429 U.S. at 107.

### 1. Plaintiff's Blood-Loss Incident

During the evening of October 1, 2010, Plaintiff reported to ODOC medical staff that he felt dizzy and that he had lost "several cups" of blood. Upon examination, Plaintiff's vital signs were normal. A few hours later, Plaintiff reported that he had passed out. Shortly after midnight, Nurse Flores escorted Plaintiff to the prison's special-housing clinic. Plaintiff appeared pale and shaky, experienced abdominal pain accompanied by hypoactive bowel sounds, and reported blood coming from his rectum. After Nurse Flores contacted Dr. Gulick, Dr. Gulick admitted Plaintiff to the infirmary for the night because of the reported rectal bleeding and ordered lab work for the morning.

Plaintiff claimed that he passed out in the infirmary and broke his nose in the ensuing fall. Nursing staff observed no blood around Plaintiff's nose and did not notice any difference in its appearance. Nurse Flores measured Plaintiff's vital signs, which were normal, and administered fluids to Plaintiff. The abdominal pain and hypoactive bowel sounds continued for

several hours, accompanied by Plaintiff's report of water retention. Blood was found in

Plaintiff's underwear and toilet. Dr. Gulick, upon report from the nursing staff, ordered Plaintiff

to a local hospital in the morning. An exam at the hospital revealed no evidence of new or old

blood in Plaintiff's nose or stomach. A colonoscopy, however, revealed diverticulosis. Plaintiff

received two units of blood at the hospital because of his history of fainting and reduced

hemoglobin level. Upon returning to the prison, Plaintiff's vital signs and eating, drinking, and

voiding were normal.

Plaintiff states that he lost "over half his blood" and that he feared for his life because of

the discomfort and bleeding that he experienced. Plaintiff does not identify the basis for his

knowledge regarding the amount of blood that he alleges that he lost. Although losing several

cups of blood could create a serious medical need, Plaintiff provides no medical evidence

regarding the amount of blood that he lost, that his life was actually in danger, or, critically, that

Defendants' responses were inadequate.[2] Defendants offer uncontroverted evidence that they

---

[2] Plaintiff asserts that an emergency-room doctor stated that Plaintiff should have been brought to the hospital right away. This is inadmissible hearsay, which is not considered on a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4). Even if this evidence were received under Federal Rule of Evidence 803(4)(A), however, there is no evidence that Dr. Gulick was deliberately indifferent to Plaintiff's medical needs when he decided to wait until morning to have Plaintiff brought to a hospital. And even if this decision were negligent, negligence is insufficient to create a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 106.

Plaintiff also asserts that an x-ray revealed that his nose was broken but identifies no objective evidence to support this assertion. Nurse Flores acknowledges that Plaintiff broke his nose at some point but is uncertain whether the break was new or old. Even when the Court accepts as true that Plaintiff broke his nose when he passed out because of this incident of blood loss, there is no genuine dispute of material fact surrounding this portion of Plaintiff's Eighth Amendment claim. The uncontroverted evidence is that Defendants evaluated Plaintiff's nose after he fainted and found no indication that it was abnormal or that it immediately required further medical attention. Plaintiff does not present evidence that Defendants' treatment of his nose was even negligent, let alone that it meets the standard of deliberate indifference that the law requires. *See Toguchi*, 391 F.3d at 1057. Thus, there is no genuine dispute over whether Defendants' treatment of Plaintiff's nose violated the Eighth Amendment.

monitored Plaintiff's vital signs, considered his bleeding to be a non-emergency, and housed him in the prison infirmary after Dr. Gulick determined that Plaintiff should be transported to the hospital for further evaluation the following morning. Because Defendants provided Plaintiff with medical care that they deemed appropriate under the circumstances and Plaintiff's arguments, at most, are only that Defendants were medically negligent, there is no genuine dispute over whether Defendants were deliberately indifferent to Plaintiff's blood loss.

### 2. Plaintiff's coccyx and knee pain[3]

Plaintiff asserts that Drs. Gulick and Shelton were deliberately indifferent to Plaintiff's coccyx pain by failing to provide surgery to remove his coccyx, which Plaintiff asserts was recommended by "up to ten" other doctors; that Drs. Gulick and Shelton were indifferent to Plaintiff's knee and coccyx pain by discontinuing a previously prescribed medication (Neurontin) without first examining him; and that Drs. Gulick and Shelton also denied Plaintiff additional medications, including Ultram, Vicodin, and Tramadol, which were possibilities suggested by outside doctors and requested by Plaintiff to treat his pain. The crux of Plaintiff's assertions, as he indicates, is that the medical care that he has received while incarcerated is not the same as the medical care that he would have received if he lived among the general population.

---

[3] Although Plaintiff does not specifically identify when the alleged violations relating to his coccyx and knee pain occurred, the Court understands Plaintiff's complaint to encompass the relevant statute-of-limitations period. Oregon's two-year statute of limitations for personal injury actions, ORS 12.110(1), applies to claims under 42 U.S.C. § 1983. *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002). A Section 1983 claim accrues when the plaintiff knows, or has reason to know, of the injury upon which he bases his action. *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991). Here, all of the alleged injuries are of the type about which Plaintiff knew, or should have known, as they occurred. Accordingly, the Court considers the relevant time period to be January 23, 2010 through January 23, 2012, the date on which Plaintiff filed this complaint.

Defendants acknowledge that they did not provide Plaintiff with coccyx removal or surgical intervention for his knee pain. Defendants, however, provide medical records that identify the bases for Defendants' decisions with respect to Plaintiff's coccyx and knee pain. In addition to meeting with ODOC medical providers, Plaintiff met with outside medical providers. Outside doctors identified that Plaintiff's coccyx is displaced, and possibly fractured, but they identified no objective issues with Plaintiff's knee. Although a specialist noted that coccyx removal was a *possible* treatment for Plaintiff's reported coccyx pain, the specialist did not find evidence of pathology that warranted its removal. Similarly, other outside doctors repeatedly recommended against removal of Plaintiff's coccyx.

Regarding Plaintiff's knee, a series of x-rays revealed no abnormality with his knee other than mild arthritis and degenerative changes resulting from Plaintiff's age and body size. Defendants, therefore, provide uncontroverted evidence that Plaintiff received medical attention for his reported coccyx and knee pain. Plaintiff, however, argues that Defendants' treatment of his coccyx pain was insufficient because Defendants lacked medical expertise in that area. Plaintiff believes that further evaluation by coccyx specialists would have resulted in better treatment of his pain. Plaintiff essentially asserts that Defendants were negligent in refusing additional evaluation and treatment relating to Plaintiff's coccyx pain

As stated earlier, negligent medical decisions do not create violations of the Eighth Amendment. *Estelle*, 429 U.S. at 107. Thus, even if refusing further evaluation and alternative treatment of Plaintiff's coccyx was negligent, Defendants' decisions were not in violation of the Eighth Amendment. The fact that Plaintiff might have been able to pursue removal of his coccyx if he was not incarcerated does not create a factual question over the need for coccyx removal or deliberate indifference to this alleged need. Any different medical opinion that exists regarding

treatment of Plaintiff's coccyx and knee pain is a difference in medical judgment, not a constitutional violation. *Id.* Additionally, because there is no evidence of a medical need to remove Plaintiff's coccyx or a need for surgical treatment of Plaintiff's knee, there is no genuine dispute of material fact that suggests that Defendants were deliberately indifferent to Plaintiff's request for further medical treatment of these issues.

Plaintiff also asserts that Defendants were indifferent to his pain by failing to provide him with requested medications, including Neurontin, Tramadol, Ultram, and Vicodin, to alleviate his chronic pain. Defendants acknowledge that they did not provide Plaintiff with the pain medications that, at times, had been prescribed to Plaintiff by other doctors. Although Plaintiff presents evidence that other doctors recommended at least some of these medications, the evidence also indicates that Drs. Gulick and Shelton declined to provide them to Plaintiff because the medications were indicated for short-term rather than chronic pain. Moreover, the uncontroverted evidence is that Defendants provided or allowed Plaintiff treatment and medication to address his pain, including a sacrococcygeal joint injection; Tylenol and ibuprofen[4]; an extra mattress; reassignment to a lower bunk bed; and a donut pillow.

"Prison officials have broad discretion to determine medical care and an inmate is not entitled to the treatment he wants." *Jackson v. Multnomah Cnty.*, 2013 WL 428456, at *6 (D. Or. Feb. 4, 2013) (citing *Tolbert v. Eyman*, 434 F.2d 625, 626 (9th Cir. 1970)). Moreover, the "failure to administer narcotic pain medication in such circumstances . . . does not rise to the level of a constitutional infringement—[Plaintiff] was provided with non-narcotic pain

---

[4] Plaintiff states that ibuprofen irritates his stomach. Accepting that ibuprofen is an unacceptable pain reliever for Plaintiff, particularly in light of Plaintiff's subsequent diagnoses of diverticulosis, the record indicates that Tylenol remained available as a pain reliever, as well as the alternative remedies described here. This does not create a factual question sufficient to suggest that Defendants denied Plaintiff pain relief or that Defendants were deliberately indifferent to his pain in violation of the Eighth Amendment.

medications, and narcotics in these circumstances were not a life necessity." *Jackson*, 2013

WL 428456, at *6; *see also Fields v. Roberts,* 2010 WL 1407679, at *4 (E.D. Cal. April 7, 2010)

(refusing to prescribe narcotic pain medication even when an outside doctor recommended it is a

difference in medical opinion on the proper course of treatment and is not a basis for an Eighth

Amendment claim). Put simply, Plaintiff is not entitled to the medication he desires. The

medication Plaintiff requested to treat his coccyx and knee pain was not a life necessity, as

indicated by Plaintiff's medical record. Rather, Defendants' substitution of one medication for

another constituted a difference in medical opinion by doctors familiar with Plaintiff's medical

history. This does not give rise to an Eighth Amendment violation. Additionally, the extensive

notes regarding Plaintiff's treatment, including Defendants' consideration of Plaintiff's specific

medication requests, as well as providing Plaintiff with additional treatment for pain relief (a

sacrococcygeal joint injection, for example), is evidence that Defendants were not indifferent to

Plaintiff's medical needs. Thus, there is no genuine despite over whether Defendants were

deliberately indifferent to Plaintiff's coccyx and knee pain.

## B.  Fourteenth Amendment Claims

Plaintiff alleges that he was denied due process by Hearings Officer Frank Serrano and

Inspector General Stan Czerniak in disciplinary hearings. The two disciplinary hearings at issue

are Disciplinary Case No. 0912-SRCI-0069-SRCI-18 ("Case No. 1"), in December 2009, and

Disciplinary Case No. 1007-SRCI-0268-SRCI-10 ("Case No. 2"), in August 2010.

Defendants argue that they are entitled to summary judgment on Plaintiff's Fourteenth

Amendment claims because: (1) the statute of limitations has run for claims relating to Case

No. 1; (2) Plaintiff received all of the process that he was due in Case No. 2; (3) there is no

supervisory liability under Section 1983; and (4) Defendants are entitled to qualified immunity.

The Court addresses the first three arguments in turn. Because the Court grants summary judgment on those bases, it does not address Defendants' qualified-immunity argument.

### 1. Case No. 1

In Case No. 1, Plaintiff was charged with possessing contraband, destroying property, and disobeying an order. These charges related to art supplies that Plaintiff borrowed from the prison. Plaintiff participated in a disciplinary hearing on December 17, 2009, but asserts that his requests for an investigation and related documents were improperly denied by Officer Serrano.

Defendants' first argue that Plaintiff's due process claim against Officer Serrano regarding Case No. 1 is time-barred. Oregon's two-year statute of limitations for personal injury actions, ORS 12.110(1), applies to claims under 42 U.S.C. § 1983. *Sain v. City of Bend*, 309 F.3d 1134, 1139 (9th Cir. 2002). A Section 1983 claim accrues when the plaintiff knows, or has reason to know, of the injury upon which he bases his action. *Bagley v. CMC Real Estate Corp.*, 923 F.2d 758, 760 (9th Cir. 1991). For purposes of accrual, an incarcerated plaintiff is given the benefit of a "prison mailbox rule," meaning that an action is deemed to commence upon deposit of a complaint in the prison mailbox ("delivery to prison authorities") rather than upon filing with the clerk of court. *Houston v. Lack*, 487 U.S. 266, 275 (1988).

Under these principles, Plaintiff's suit commenced on the date that he mailed his complaint. Although the record is unclear as to when Plaintiff mailed his complaint, he dated the complaint both January 15, 2012, and January 18, 2012, and it was ultimately filed with the Court on January 23, 2012. Granting the beneficial inference to Plaintiff, the Court accepts January 15, 2012, as the date Plaintiff's suit commenced. Therefore, to be considered timely under Oregon law, Plaintiff's claims must have accrued on or after January 15, 2010.

Plaintiff's disciplinary hearing for Case No. 1 took place on December 17, 2009. Plaintiff participated in the hearing after receiving a copy of the misconduct report on December 13,

2009. Because the alleged due process violations—the denial of Plaintiff's request for an investigation and related documents—occurred in December 2009, Plaintiff was, or should have been, aware of the alleged injury at that time. Thus, his due process claim relating to Case No. 1 accrued in December 2009. Because Plaintiff's claim accrued before January 15, 2010, the two-year statute-of-limitations period had already expired when his suit commenced. Accordingly, the due process claim with respect to Case No. 1 must be dismissed.[5]

### 2. Case No. 2

Plaintiff's due process claim with respect to Case No. 2, however, is not time-barred because it accrued in August 2010, when the disciplinary proceedings took place. Thus, the claim is within the applicable statute-of-limitations period. In Case No. 2, Plaintiff was charged with violating ODOC rules relating to the possession and distribution of contraband, racketeering, and fraud. The contraband at issue involved sexually explicit images that violated prison policy. Hearings Officer Peter Sturdevant conducted the hearing, which began on August 19 and continued on August 24, 2010. Plaintiff argues that he was denied due process in Case No. 2 because: (a) the same charges against Plaintiff had previously been dismissed; (b) Defendants had insufficient evidence to find him guilty of the violations with which he was charged; and (c) Plaintiff was improperly denied the opportunity to call witnesses.

### a. Previous dismissal without prejudice

Plaintiff asserts that Officer Serrano, in a previous action, improperly dismissed the charges at issue without prejudice for lack of evidence but then coached someone how to rewrite the disciplinary report against Plaintiff so that the charges could be brought again.

---

[5] Because this claim is time barred, the Court does not address Defendants' additional arguments relating to Case No. 1.

Oregon Administrative Rules ("OAR") specifically allow for the dismissal of rule violations without prejudice and resubmission of the charges in another misconduct report. OAR 291-105-0026(5). When the U.S. Supreme Court has enumerated due process requirements for prison disciplinary proceedings, the right to have a claim dismissed with prejudice is not among them. *See e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 559 (1974) (citing *Morrissey v. Brewer*, 404 U.S. 471, 488-89 (1972)). Therefore, the second misconduct report did not violate Plaintiff's due process rights simply because the first report was dismissed without prejudice.

### b.  Sufficiency of evidence

Plaintiff argues that Defendants had insufficient evidence in Case No. 2 to find Plaintiff in violation of the rules with which he was charged. Although Officer Sturdevant, who conducted the disciplinary hearing relating to Case No. 2, is not a named defendant in this case, Plaintiff's claim also fails on its merits.

Procedural due process requires notice and an opportunity to be heard, provided at a time and in a manner so as to be meaningful. *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972). "To obtain relief on § 1983 claims based upon procedural due process, the plaintiff must establish the existence of '(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process.'" *Guatay Christian Fellowship v. Cnty. of San Diego*, 670 F.3d 957, 983 (9th Cir. 2011) (quoting *Portman v. Cnty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993)).

There is no dispute that Plaintiff received notice and an opportunity to be heard in Case No. 2. Plaintiff instead appears to argue that the outcome of Case No 2. is so baseless that it necessarily evidences a due process violation. Disciplinary actions by prison officials must be supported by "some evidence" to comport with the due process requirements of the Fourteenth

Amendment. *Bruce v. Ylst*, 351 F.3d 1283, 1287 (9th Cir. 2003) (citing *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 454 (1985)). "Evidence must meet minimal standards of reliability." *Toussaint v. McCarthy*, 926 F.2d 800, 806 (9th Cir. 1990). A court does not "reweigh the evidence; rather, 'the relevant question is whether there is any evidence in the record that could support the conclusion.'" *Bruce*, 351 F.3d at 1287 (quoting *Superintendent*, 472 U.S. at 455-56).

Here, prison officials charged Plaintiff with violating rules relating to racketeering, distribution, and contraband possession through his sales of sexually explicit images, including freestanding nude and semi-nude images, in violation of ODOC rules. The evidence cited by prison officials to support the charges against Plaintiff included tally sheets labeled "porn"; a phone conversation between Plaintiff and a third party in which Plaintiff describes "porn" as a commodity and suggests using pencil to address envelopes so that the writing can be erased; a request from a fellow inmate specifically for porn; and Plaintiff's prison money-account records showing credits and debits from outside parties and fellow inmates. Plaintiff does not question the reliability of this evidence. Rather, he provides an alternative explanation of what the evidence shows and asserts that there is not sufficient evidence to charge him with rule violations. The exhibits identified by Defendants, however, constitute "some evidence," which the Court does not reweigh. *Superintendent*, 472 U.S. at 454-55. Because the charges that Defendants' brought against Plaintiff in Case No. 2 were supported by at least "some" evidence, and its reliability is not in question, there is no genuine dispute of material fact that Plaintiff's due process rights were violated by the amount of evidence on which Plaintiff was found guilty of rule violations in Case No. 2.

### c.  Opportunity to call witnesses

Plaintiff also argues that his due process rights were violated when Officer Sturdevant did not allow Plaintiff to call witnesses. Due process in a prison disciplinary proceeding can include the opportunity to call witnesses and present documentary evidence.[6] *Wolff*, 418 U.S. at 566. This right is not unrestricted, however, and is subject to the consideration of prison safety and disciplinary goals. *Id.* Thus, prison officials have discretion, which is subject to the "mutual accommodation between institutional needs and objectives and the provisions of the Constitution." *Baxter v. Palmigiano*, 425 U.S. 308, 321 (1976) (citing *Wolff*, 418 U.S. at 556). The irrelevance of a witness and the lack of necessity for a witness are two permissible justifications that prison officials may provide when refusing to allow a prisoner to call witnesses. *See Wolff*, 418 U.S. at 566. Here, Plaintiff's request for witnesses was denied "because witness testimony would not have constituted a defense to the alleged rule violations" with which Plaintiff was charged. This is a valid reason for prison officials to deny Plaintiff's request to call witnesses, a decision that is within their discretion to make. *See id.* Plaintiff does not challenge the sufficiency of this explanation. Accordingly, the refusal of Plaintiff's request for witnesses in Case No. 2 did not violate Plaintiff's due process rights.

---

[6] This right only attaches when a disciplinary action implicates a protected liberty interest. *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (citing *Sandin v. Connor*, 515 U.S. 472, 484 (1995)). Three factors guide the case-by-case inquiry into whether a protected liberty interest is implicated: "(1) whether the challenged condition 'mirrored those conditions imposed upon inmates in administrative segregation and protective custody,' and thus comported with the prison's discretionary authority; (2) the duration of the condition, and the degree of restraint imposed; and (3) whether the state's action will invariably affect the duration of the prisoner's sentence. *Serrano*, 345 F.3d at 1078 (quoting *Sandin*, 515 U.S. at 486-87). Here, Plaintiff suggests that his overall prison sentence may be affected from the adverse outcome of the disciplinary proceeding. Although the only evidence that Plaintiff offers to support this assertion is his declaration, which does not indicate that an adverse outcome would *invariably* affect his sentence, for purposes of Defendants' summary judgment motion the Court accepts that Case No. 2 implicated a protected liberty interest of Plaintiff's.

PAGE 15 – OPINION AND ORDER

Plaintiff also brings due process claims against Mr. Czerniak. Plaintiff argues that Mr. Czerniak improperly "rubber stamped" the adverse outcome in Case No. 2 by failing to impartially investigate the charges and that he is liable as a supervisor of the disciplinary process. The OARs do not provide a right to an appeal of disciplinary proceedings. *See* OAR 291-105-005 through 291-105-0100. The OARs allow the inspector general to vacate any part of a disciplinary order or reopen the disciplinary hearing in the interest of justice. OAR 291-105-0100. This, however, is not a right to which a prisoner is entitled. *See id*. ("The Inspector General . . . *may*, in the interest of justice, vacate all or part of a final disciplinary order or withdraw the order and direct that a disciplinary hearing be reopened for consideration of new evidence.") (emphasis added). Therefore, Mr. Czerniak did not violate a right of Plaintiff's by deciding not to vacate or reopen the adverse judgment in Case No. 2.

Mr. Czerniak also cannot be liable as a supervisor of the disciplinary process. Claims brought pursuant to 42 U.S.C. § 1983 must be brought against an individual defendant for his or her own conduct, not under a theory of vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Thus, a defendant can only be held liable as a supervisor under Section 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Bacca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). Here, Mr. Czerniak is a supervisor of the disciplinary process in his role as inspector general. As discussed above, however, Plaintiff does not have a right to an internal appeal to a prison disciplinary proceeding. Thus, there is no constitutional violation for which Mr. Czerniak can be liable. Additionally, there is no evidence that Mr. Czerniak was personally involved in the disciplinary proceedings, which precludes liability. And even if

Mr. Czerniak were involved, there is no genuine dispute that Plaintiff received the process that he was due.

For these reasons, Defendants' motion for summary judgment on Plaintiff's Fourteenth Amendment claims is granted.

## C.  First Amendment Claims Relating to Prohibited-Mail Policy

Plaintiff alleges that ODOC's policy prohibiting the receipt in inmate mail of sexually explicit material violates the First Amendment. Plaintiff specifically challenges the portion of ODOC's prohibited-mail policy (# 291013109935) that bans the receipt of freestanding nude and partially nude images in inmate mail. The mail policy, incorporating OARs 291-131-0025(11)(D) and 291-131-0035(1)(a)(D), in part prohibits:

> Freestanding Nude or Partially Nude Images: Newspaper and magazine/clippings and tear-outs, photocopies, printed web pages, drawings, photographs, and other media with nude or partially nude subjects, whether human or cartoon, that depict or display male or female genitalia, pubic area or anus, or expose the areola, may not be attached to or enclosed in correspondence to inmates.

Material meeting the above criteria "shall be confiscated or returned to the sender." OAR 291-131-0035(1)(a)(D). Additionally, OAR 291-131-0037(2)(b)(A) provides that any envelope containing unauthorized attachments or enclosures will be returned to the non-inmate sender with the envelope's contents intact. Plaintiff challenges the mail policy both facially and as applied to the images that Defendants did not deliver to Plaintiff.

### 1.  Facial Challenge to Mail Regulations

Inmates have a First Amendment right to receive mail.[7] *Prison Legal News v. Lehman*, 397 F.3d 692, 699 (9th Cir. 2005). The scope and potency of these rights, however, are "subject

---

[7] The First Amendment is made applicable against state and local governments by the Fourteenth Amendment. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).

to substantial limitations and restrictions in order to allow prison officials to achieve legitimate

correctional goals and maintain institutional security." *Walker v. Sumner*, 917 F.2d 382, 385

(9th Cir. 1990). To determine whether a correctional institution's regulation that "impinges on

inmates' constitutional rights" is valid, the court must determine whether that regulation "is

reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

*Turner* sets forth a four-factor test that courts must apply in making this determination:

> (1) whether the regulation is rationally related to a legitimate and
> neutral governmental objective; (2) whether there are alternative
> avenues that remain open to the inmates to exercise the right;
> (3) the impact that accommodating the asserted right will have on
> other guards and prisoners, and on the allocation of prison
> resources; and (4) whether the existence of easy and obvious
> alternatives indicates that the regulation is an exaggerated response
> by prison officials.

*Prison Legal News v. Cook*, 238 F.3d 1145, 1149 (9th Cir. 2001) ("*PLN I*") (citing *Turner*, 482

U.S. at 89-90)).

### a. Rational relationship

The first *Turner* factor requires "a valid, rational connection between the prison

regulation and the legitimate governmental interest put forward to justify it." *Turner*, 482 U.S.

at 89 (quotation marks and citation omitted). This requires a court to determine whether the

governmental objective underlying the policy is (1) legitimate, (2) neutral, and (3) "rationally

related to that objective." *Mauro v. Arpaio*, 188 F.3d 1054, 1059 (9th Cir. 1999) (en banc)

(quoting *Thornburgh v. Abbott*, 490 U.S. 401, 414 (1989)).

Defendants identify prison security as the reason for prohibiting sexually explicit material

such as freestanding nude and partially nude images. Because freestanding images are not

stamped with an inmate's identification number, Defendants argue that the freestanding images

are susceptible to bartering among inmates, which creates a threat to inmate safety. The difficulty

of controlling these "high-value" items, Defendants assert, increases the risk of aggressive inmate behavior and inappropriate tendencies. The security concerns that Defendants identify are legitimate penological objectives. *Thornburgh*, 490 U.S. at 414-15 (holding that for incoming prison communications prison administrators must have broad discretion and that regulations on incoming publications "are expressly aimed at protecting prison security," the legitimacy which "is beyond question"). Because the OARs prohibiting freestanding nude and partially nude images, and the prohibition on sexually explicit material more generally, aim to promote prison security, they are legitimate.

The regulations must also be neutral. Neutrality depends on whether the regulation operates "without regard to the content of the expression." *Turner*, 482 U.S. at 90. Neutrality in this context "was intended to go no further than its requirement . . . that 'the regulation or practice in question must further an important or substantial governmental interest unrelated to the suppression of expression.'" *Abbott*, 490 U.S. at 415 (quoting *Procunier v. Martinez*, 416 U.S. 396, 413 (1974)). Accordingly, where "prison administrators draw distinctions between publications solely on the basis of their potential implications for prison security, the regulations are 'neutral' in the technical sense in which [the Supreme Court] meant and used that term in *Turner*." *Id.* at 415-16. Here, the regulation prohibits mail containing sexually explicit material because of security concerns and does not aim to suppress expression but rather operates neutrally within the first *Turner* factor. *See Mauro*, 188 F.3d at 1059 (finding neutral a prison regulation banning material containing frontal nudity). Accordingly, the prohibited-mail policy at issue here, including its prohibition on freestanding nude and partially nude images, is neutral.

Additionally, the prison regulation must be rationally related to the governmental objective that it promotes. A "regulation cannot be sustained where the logical connection

between the regulation and the asserted goal is so remote as to tender the policy arbitrary or

irrational." *Turner*, 482 U.S. at 89-90. Courts, however, must give prison regulations deferential

review. *Mauro*, 188 F.3d at 1058 (citing *Turner*, at 482 U.S. at 89). Thus, the "only question is

whether prison administrators reasonably could have thought the regulation would advance

legitimate penological interests." *PLN I*, 238 F.3d at 1150. A prison does not need to prove that

banned images caused problems in the past. *Id.* Rather, a prison only needs to establish a

commonsense connection between the regulation and the objective. *Frost v. Symington*, 197 F.3d

348, 356 (9th Cir. 1999).

Here, Defendants argue that material containing nudity increases aggressive behavior.

Plaintiff, however, asserts that denying prisoners access to nude images jeopardizes inmate

safety because it leads to assaultive homosexual activity among inmates. The tension between

these two arguments does not create a genuine dispute of material fact. The United States Court

of Appeals for the Ninth Circuit, when directly addressing prison mail policies prohibiting

sexually explicit material similar to the mail policy at issue here, found that prohibiting sexually

explicit materials, including nude images, in inmate mail is rationally related to legitimate

governmental objectives such as those identified by Defendants. *See Bahrampour v.

Lambert*, 356 F.3d 969, 976 (9th Cir. 2004); *Mauro*, 188 F.3d at 1059. Additionally, deference

must be given to the judgment of prison officials when evaluating whether a rational relationship

exists between a regulation and a penological objective. Here, Defendants could reasonably

believe that prohibiting freestanding nude and partially nude images in inmate mail enhances

prison security because of the difficulty of controlling freestanding images and the potential for

bartering and aggressive behavior that the possession of such images creates. Thus, there is a

commonsense nexus between freestanding nude and partially nude images and an increased

threat to prison security, which provides a rational, legitimate reason to prohibit such content in inmate mail. This factor favors Defendants.

### b. Alternative avenues

The second *Turner* factor is "whether there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. "In applying this factor, 'the right in question must be viewed sensibly and expansively.'" *Mauro*, 188 F.3d at 1061 (quoting *Abbott*, 490 U.S. at 417). Although prisoners have the right to "receive sexually explicit communications[,] . . . there are many alternative means available to the inmates" despite a prohibition on sexually explicit materials that contain frontal nudity. *Mauro*, 188 F.3d at 1061. Alternatives include sexually explicit letters and articles, as well as non-nude images. *Id.* This reasoning applies equally here because ODOC's prohibited-mail policy is targeted at sexually explicit images. Plaintiff does not argue or present evidence that the mail policy is broader than this, or that alternative avenues do not remain available to him. Additionally, Defendants acknowledge that the mail policy does not prohibit sexually explicit letters or non-nude or partially nude images. Thus, there is no genuine dispute that alternate avenues remain for Plaintiff to receive the sexually explicit communications to which he is entitled. Accordingly, this factor also favors Defendants.

### c. Effects on staff, inmates, and resources

The third *Turner* factor is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Turner*, 482 U.S. at 90. When applying this factor, "courts should be particularly deferential to the informed discretion of corrections officials," especially when the accommodation of a constitutional right will "have a significant 'ripple effect' on fellow inmates or prison staff." *Id.* Thus, this factor carries weight particularly when a mail policy that targets potentially disruptive

PAGE 21 – OPINION AND ORDER

content is at issue. *See, e.g.*, *Turner*, 482 U.S. at 92-93; *Frost*, 197 F.3d at 351-52. Here, Defendants argue that freestanding nude and partially nude images pose a particular risk to the safety of inmates and prison staff because such images in freestanding form are difficult to control and easily lend themselves to bartering. Additionally, non-freestanding sexually explicit images pose a similar security risk, as identified above. Because this risk assessment is based on the informed discretion of prison officials and there is no evidence to contradict it, the third *Turner* factor favors Defendants.

### d.  Easy and obvious alternatives

The fourth and final *Turner* factor requires courts to consider "whether the existence of easy and obvious alternatives indicates that the regulation is an exaggerated response by prison officials." *PLN I*, 238 F.3d at 1149. If a "claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. *Turner*, 482 U.S. at 91. Here, even if the prison were to expend the resources to stamp such images to make them less susceptible to bartering, as the prison does with books and magazines, the ease with which freestanding images can be concealed because of their size poses the same security risk that the regulations are intended to prevent. Moreover, sexually explicit images are prohibited in any form, freestanding or not, because even a stamped sexually explicit image poses a security risk of the type that the prohibition is designed to prevent. Plaintiff identifies no alternative to the valid penological interest of prohibiting sexually explicit images in inmate mail. Because the lack of any identifiable alternatives to the prohibited-mail policy indicates that it is not an exaggerated response, the fourth *Turner* factor also favors Defendants.

Because there is no genuine dispute that all four *Turner* factors favor Defendants, the ODOC prohibited-mail policy (# 291013109935), and the OARs it incorporates, do not facially violate Plaintiff's First Amendment rights.

### 2. As-Applied Challenge to Prohibited-Mail Policy

Plaintiff also challenges the prohibited-mail policy (# 291013109935), incorporating OARs 291-131-0025(11)(D) and 291-131-0035(1)(a)(D), as applied to several pieces of mail that Defendants did not deliver to him. The Court has conducted an *in camera* review of the mail that Plaintiff asserts did not violate the mail policy. Some of the envelopes sent to Plaintiff that were returned to sender and filed *in camera* with the Court include freestanding images of clothed women and written letters containing no images. Defendants acknowledge that some of the materials that they returned to the non-inmate sender included materials that did not violate the policy. Defendants, however, state that the non-infringing materials were included in the same envelope as infringing materials—specifically, materials that violated the ban on nude or partially nude images.

OAR 291-131-0037(2)(b)(A) provides, "Contraband (including unauthorized attachments or enclosures) not illegal or evidence of crime shall be returned to the non inmate sender with the contents of the envelope or package intact, together with a Mail Violation Notice." In accordance with this regulation, Defendants returned all material contained in the same mailing to the non-inmate sender, which included the non-infringing material on which Plaintiff's complaint is based.

Based on the Court's review of the *in camera* documents, each envelope that contained non-infringing material also contained at least one photograph that violated the prohibition on freestanding nude or partially nude images. As discussed above, both this specific prohibition and the prohibited-mail policy as a whole are constitutionally valid. Although Defendants did not

PAGE 23 – OPINION AND ORDER

deliver to Plaintiff images to which he would have been otherwise entitled to receive through inmate mail had they been sent separately, it is not because Defendants misapplied or broadened the scope of the prohibited-mail policy. Rather, Defendants applied a separate mail regulation—OAR 291-131-0037(2)(b)(A)—that requires all contents of a mailing that contains any infringing material to be returned intact to the sender. This does not alter Plaintiff's right to receive mail that complies with prison rules.

Because there is no genuine dispute of material fact in Plaintiff's First Amendment challenges relating to ODOC's prohibited-mail policy, Defendants' motion for summary judgment on these claims is granted.

**D.  First Amendment Retaliation Claims**

Plaintiff alleges retaliation in violation of his First Amendment rights. Plaintiff asserts that Dr. Shelton and Dr. Gulick retaliated by denying Plaintiff adequate medical care because of lawsuits that Plaintiff previously filed. Plaintiff also asserts that Mr. Doman and Mr. Spang retaliated by denying Plaintiff access to incoming mail and library materials because of Plaintiff's previously filed lawsuits and grievances that he filed within the prison. Additionally, Plaintiff asserts that Captain Eastwood[8] and Captain Real retaliated against him during the course of disciplinary proceedings because of Plaintiff's previous complaints. Defendants argue that Plaintiff's retaliation claims fail as a matter of law because Plaintiff cannot establish (1) that his First Amendment rights were chilled; (2) that the allegedly adverse actions were taken because of Plaintiff's complaints; or (3) that Defendants' actions did not further legitimate penological interests.

---

[8] The retaliation claim against Captain Eastwood relates to Disciplinary Case No. 1. For the same reasons, discussed previously in this opinion, that Plaintiff's due process claim related to Case No. 1 is time-barred, Plaintiff's retaliation claim against Captain Eastwood is time-barred.

In *Rhodes v. Robinson,* the Ninth Circuit set forth five basic elements necessary to bring a "viable claim of First Amendment retaliation" in the prison context: "(1) [a]n assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted); *see also Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2009).

### a.  Medical care

Plaintiff argues that Dr. Shelton and Dr. Gulick retaliated by denying him medication prescribed by other doctors and denying his request for surgery to remove his coccyx. Plaintiff also alleges that "nurses and doctors have told me that I am wasting my time coming to medical for my coccyx and knees and that no medications will be given for these problems," and that Plaintiff should quit wasting everyone's time by asking. Dkt. 225, ¶ 41. Defendants identify their familiarity with Plaintiff's medical history and the lack of medical necessity as reasons for providing Plaintiff with alternative medications to those that he desired. Defendants also identify the lack of medical indication for coccyx removal as a reason for denying Plaintiff's request for surgery.

With regard to Plaintiff's allegation that Dr. Shelton and Dr. Gulick retaliated against Plaintiff by voiding prescriptions relating to his knee and coccyx pain, Plaintiff provides insufficient evidence to create a genuine dispute that Dr. Shelton's or Dr. Gulick's actions were because of Plaintiff's previously filed lawsuits. Although the chronology of events can serve as circumstantial evidence that allows an inference of retaliation, *Pratt v. Rowland*, 65 F.2d 802, 808 (9th Cir. 1995), the timing here does not support such an inference. The evidence in the record reveals that Plaintiff's requests for specific medications and coccyx surgery were initially

PAGE 25 – OPINION AND ORDER

denied *before* Plaintiff filed lawsuits against ODOC officials, because they were not medically indicated. Plaintiff offers no medical evidence that his medical needs changed to create an inference that the medical decisions subsequently became retaliatory.

### b.  Disciplinary hearing

Plaintiff argues that Captain Real retaliated by allowing a "false" report to be written against Plaintiff because of his past complaints against ODOC officials. The report at issue led to the disciplinary hearing in Case No. 2, described above.

Plaintiff offers as evidence in support of his relation claim an assertion that the charges against him for contraband distribution and possession involved several inmates but that Plaintiff is the only person against whom charges were filed. Plaintiff also alleges that a hearings officer said that such a situation "was weird and unusual." This evidence, however, is insufficient to create a genuine dispute of material fact to support Plaintiff's retaliation claim. The possession and distribution of contraband is not protected conduct, which is a necessary element of a retaliation claim. *Rhodes*, 408 F.3d 559, 567-68. Moreover, disciplinary proceedings serve to deter prohibited conduct among prisoners, which furthers the legitimate penological objectives of prison security and inmate safety. This is another necessary element of a retaliation claim, which is not satisfied here. *See id.* Even if other prisoners could have been charged with similar violations, and even if Plaintiff was targeted, there is insufficient evidence in the record to suggest that Plaintiff engaged in protected conduct that was abridged or that adverse action was taken against him unrelated to legitimate penological objectives.

### c.  Incoming mail

Plaintiff also asserts retaliation claims against Mr. Doman and Mr. Spang relating to the non-delivery of the nude and partially nude images discussed above. Plaintiff alleges that these actions were motivated by Plaintiff's past grievances against ODOC officials. The evidence in

PAGE 26 – OPINION AND ORDER

the record, however, indicates that the mail at issue was not delivered to Plaintiff because it violated prison mail rules. Because these rules reasonably further the legitimate penological objectives of prison safety and security, as discussed above, the evidence that Plaintiff provides is insufficient to satisfy this element of a retaliation claim. Additionally, the record indicates that neither Mr. Doman nor Mr. Spang was involved in processing the mail that Plaintiff argues should have been delivered to him.

### d.  Library materials

Plaintiff alleges that Mr. Doman denied Plaintiff access to library materials to which he was entitled. Plaintiff does not identify what library materials he was denied or when he was denied access to them. Plaintiff fails to provide evidence that there is a genuine dispute of material fact regarding this allegedly adverse action by Mr. Doman. Accordingly, this claim fails as a matter of law.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. 192) is GRANTED. Plaintiff's motion for summary judgment (Dkt. 222) is DENIED. This case is dismissed.

**IT IS SO ORDERED**.

DATED this 6th day of May, 2015.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge